## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SO APARTMENTS, LLC,  STATION AT ELM CREEK, LLC, | § § § | |
| *Plaintiffs* | § | Case No.  SA-23-CV-00992-XR |
| vs. | § § | |
| CITY OF SAN ANTONIO, TEXAS, | § § | |
| *Defendant* | § | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On this date, the Court considered Defendant's motion for summary judgment (ECF No. 34), Plaintiffs' response (ECF No. 37), Defendant's reply (ECF No. 38), and the parties' arguments at the hearing held on February 25, 2025. After careful consideration, the Court **GRANTS** Defendants' motion for summary judgment.

## BACKGROUND

Plaintiffs SO Apartments, LLC ("Spanish Oaks") and Station at Elm Creek, LLC ("Elm Creek"), owners of two apartment complexes in the City of San Antonio (the "City"), challenge the City's Proactive Apartment Inspection Program (the "Program"), as unconstitutional under the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

The San Antonio Property Maintenance Code, which applies to all residential and nonresidential structures and premises, is enforced by the Development Services Department (the "DSD"). Code §§ 6-52, 101.2, 103.1. DSD officials conduct inspections of properties for potential Code violations. *Id.* § 6-52, 104.2. If a Code violation is found, the property owner may ultimately be subject to civil or criminal penalties, including daily fines between $100 and $2,000. *Id.* §§ 6-52, 106.3–106.4.

1

In light of a documented pattern of property code violations, the City established the Program after a months-long collaborative process involving community stakeholders, including tenants, property management companies, and apartment owners, with the aim of incentivizing good property management and increasing accountability. *See* City Ordinance No. 2023-03-23-016; Code of Ordinances ("the Code") §§ 6-16 *et seq.* (2023). The purpose of the Program is to address property owners who are not maintaining their property to minimum building Code standards and who have allowed their property to develop "health, life, welfare and safety problems." Code § 6-66(a).

The Ordinance requires apartment complexes with five or more units to enroll in the Program if they accrue three or more uncured code citations within a six-month period, after which they are subject to a $100 per-unit annual fee and monthly inspections by City Code enforcers.

## I.      Program Procedures

New property inspections are typically initiated via the City receiving a notice of potential violation from a citizen. ECF No. 8-1, Declaration of DSD Official Michael Shannon ¶ 6. If a violation of the City's property maintenance code is found, the property owner receives a notice of violation. Code § 6-52, 106.3. If the type of violation is one of those identified as subject to the Program, the owner receives a notice that provides that a violation was observed, that the owner has ten days to cure the identified violation, and that failure to cure may result in enrollment in the Program. Code §§ 6-67(a), 6-66(c)(5). A property owner can request additional time to cure if necessary. Code § 6-66(c).

If the property owner refuses or fails to correct the violative condition within the cure period, a citation is issued and the owner is subject to civil or criminal penalties. Code § 6-52, 106.3. The property owner then has the choice of whether to pay the penalty or proceed to a

2

hearing. In a hearing, the property owner has the opportunity to dispute the citation. Depending on the nature of the citation, the hearing generally takes place in front of either an Administrative Hearing Officer or the Municipal Court. Code § 6-52, 107.2.

When an applicable property owner is issued a citation, it will contemporaneously receive a "program point" if the violation found is one that falls within one of the enumerated maintenance provisions subject to the Program. Code § 6-67(d). The issuance of a program point may be administratively appealed, separately and concurrently from the appeal of the underlying citation. Code § 6-67(e).

If a property owner receives three program points within a six-month period, the property owner must enroll in the Program and pay an annual administrative fee of $100 per unit, which is used to cover the additional costs of monitoring enrolled complexes. Code § 6-68; ECF No. 8-1, Shannon Decl.

The DSD may inspect such properties on at least a monthly basis. Code § 6-71. Inspections of this sort encompass the entire apartment complex, including appurtenances, side structures, and infrastructure, as well up to five percent of all dwelling units, and a minimum of two units. *Id.* "The owner shall not prohibit, bar or obstruct entry by the code official upon the premises, or any structure" in an enrolled complex. *Id.* Further, upon ten days' notice, the owner "shall provide access to habited dwelling units in order to permit a complete inspection." *Id.* In practice, DSD officials obtain tenants' consent before inspecting their apartments. Code officials randomly select which units they want to enter, but if the tenant does not want them to enter, the officials move onto the next apartment, also selected at random. ECF No. 38-1, Dep. of DSD Inspector Dale Russell at 168:15–18.1

An enrolled apartment complex "graduates" the Program by curing the original violations and obtaining no more than two additional program points in a six-month period after enrollment. Code § 6-72. Since the launch of the Program in April 2023, the City has inspected 1,892 apartment complexes, of which 42 have been enrolled in the Program. *See Proactive Apartment Inspections Program Activity Report*, CITY OF SAN ANTONIO, https://perma.cc/8JH3-9UPC.

## II.     Plaintiffs' Program Enrollment

On April 19, 2023, Spanish Oaks received four notices of violations and associated program points. relating to cracked windows, broken gutters, and a rotting balcony. ECF No. 8-1, Shannon Decl. ¶ 9. On May 5, 2023, Elm Creek received twelve notices of violations and points, all related to stairways in disrepair. *Id.* ¶10.

After failing to cure the violations, the Complexes were fined for each violation, totaling $1,200 for Spanish Oaks and $3,600 for Elm Creek. The Complexes unsuccessfully disputed their citations or program points and enrolled in the Program.[1] Spanish Oaks and Elm Creek incurred Program fees of $12,500 and $32,400, respectively. Both Plaintiffs have since graduated from the Program. ECF No. 34-2, Deposition of Dale Russell at 126: 6–10.

## III.    Procedural History

On July 31, 2023, Plaintiffs filed suit against the City in state court, challenging the constitutionality of the Program on three grounds. ECF No. 1-3. First, they argued that the Program violated the Fourth Amendment because it authorized frequent and "warrantless inspections" of private property. Second, they posited that the Program's $100 per unit administrative fee violates the Eighth Amendment's prohibition against excessive fines. Lastly, they contended that the

---

[1] Several months after the initial hearing, Spanish Oaks successfully overturned two of the citations (which resulted in program points) at a re-hearing. However, Spanish Oaks had previously obtained additional, unrelated citations and program points that would have resulted in three program points and enrollment in the Program despite the overturning of the prior points. ECF No. 34-2, Russell Dep. at 116:3–16; 117:21–118:3.

Program denied them the procedural and substantive due process protections of the Fourteenth Amendment. The City removed the case to this Court based on federal question jurisdiction, ECF No. 1, and Plaintiffs filed an amended complaint, the operative pleading, ECF No. 4.

Plaintiffs moved for a preliminary injunction and, after a hearing, the Court denied their request, finding they failed to show any of the four requisites for a preliminary injunction. *See* Text Order (Sept. 25, 2023). On appeal, the Fifth Circuit affirmed the Court's decision. *SO Apartments, L.L.C. v. City of San Antonio*, 109 F.4th 343 (5th Cir. 2024).

Following discovery, the City filed a motion for summary judgment on all of Plaintiffs' constitutional challenges to the Program. After a hearing on February 25, 2025, and for the reasons stated herein, the Court **GRANTS** the motion.

## DISCUSSION

## I.    Legal Standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir.

1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

II.    **Analysis**

A.  **Fourth Amendment – Unlawful Search Claim**

Plaintiffs first assert a Fourth Amendment facial challenge to Code § 6-71, arguing that it "mandates that DSD employees have sole discretion to enter any *habited* dwelling units for any apartment complex enrolled on the Bad Actor registry, and the Ordinance prohibits property owners from refusing access." ECF No. 4 ¶ 42 (emphasis added). Plaintiffs allege that the Program promulgates a practice "of permitting indiscriminate, warrantless, and nonconsensual searches by DSD employees obviously violates the Fourth Amendment." *Id.* ¶ 43. Plaintiffs, however, have proffered no evidence that the Ordinance facially offends the Fourth Amendment.

The Fourth Amendment protects from unreasonable searches in areas only where there is a "reasonable expectation of privacy." *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). Apartment complexes, as a mix of common and private spaces, require courts to analyze whether the Fourth Amendment provides protection for a particular area at all and, if so, to whom the protection applies.

Property owners have no reasonable expectation of privacy in the exterior of their complexes or common spaces that are open to the public and easily visible to passersby. *United States v. Ramirez*, 145 F. App'x 915, 923 (5th Cir. 2005) (noting that when evaluating common or public areas, the "courts generally hold that a party possesses no reasonable expectation of privacy and that the Fourth Amendment is thus not implicated"). Thus, neither a warrant nor consent would be necessary to inspect those portions of the property that are accessible and visible to everyone. Similarly, landlords do not have a derivative right to their tenants' reasonable expectation of privacy in their homes.[2] *See United States v. Pack*, 612 F.3d 341, 347 (5th Cir. 2010) ("Fourth

---

[2] In support of their Fourth Amendment claim, Plaintiffs proffer examples of allegedly defective warrants for administrative searches of inhabited units in their complexes. At the outset, the very existence of such warrants

Amendment rights are personal rights, which may be enforced only by the person whose rights were infringed.").

Plaintiffs' complaint appears only to challenge warrantless inspections of *inhabited* units. *See* ECF No. 4 ¶ 42. But Plaintiffs do not have standing to challenge the search of inhabited units. *See States v. Wiggins*, No. 4:21-CR-00066, 2023 WL 5321077, at *3 ("Prior decisions where landlords asserted Fourth Amendment challenges demonstrate that she lacks standing to challenge the search of the subject bedroom.").

To the extent that Plaintiffs seek to challenge searches of their uninhabited units, nothing on the face of the Code "mandates" or even allows warrantless searches in violation of the Fourth Amendment. The Program "does not exist in a legal vacuum" and thus "does not need to reiterate the protections afforded by the Fourth Amendment." *SO Apts.*, 109 F.4th at 349–50. Indeed, as the Fifth Circuit explained, "other provisions of the Code incorporate by reference standard Fourth Amendment warrant requirements, which cabin the City inspectors' ability to enter an apartment complex without a warrant. *SO Apts.*, 109 F.4th at 349 n.19 (citing Code § 6-52, 104.3 ("The code official is authorized to enter the structure or premises at reasonable times to inspect *subject to legal restrictions.*") (emphasis added); *id.* § 10-5(g) ("If entry is refused, the building official has recourse to the remedies *provided by law* to secure entry.") (emphasis added)).

---

demonstrates that the challenged Ordinance does not "mandate[]" warrantless searches of inhabited units. ECF No. 4 ¶ 42. Plaintiffs also complain that the City only began issuing administrative warrants in connection with the Program after the onset—and because of—this litigation. That argument is immaterial to Plaintiff's facial challenge, however. That some officials may have incorrectly believed they were entitled to conduct warrantless searches of inhabited units *before* this litigation does nothing to support Plaintiffs' position that the Code *mandates* such searches on its face. Without evidence of a City policy of enforcing warrantless searches or of pretextual denial of procedural safeguards, the mere risk of discretionary enforcement is insufficient to sustain a facial Fourth Amendment challenge.

In practice, Code officials obtain tenants' consent to enter their apartments, mitigating the risk of unfettered discretion. DSD inspectors randomly select which units they want to enter, but if the tenant does not want them to enter, the officials move onto the next apartment, also selected at random. ECF No. 38-1, Russell Dep. at 168:15–18.1

As the City puts it, "just because the text of the Code does not include the word 'warrant,' does not mean that it operates outside of familiar constitutional dimensions." ECF No. 34 at 10; *see Garris v. City of L.A.*, 798 F. App'x 155, 156 (9th Cir. 2020) (ordinance not facially unconstitutional where "the Ordinance [gave] no indication that the law enforcement powers it [gave] inspectors permit[ed] such inspectors to hunt for evidence of general criminal wrongdoing"). Indeed, it is a "cardinal principle" of statutory question that courts should construe a statute to *avoid* constitutional problems unless such a construction is "plainly contrary to the intent of [the legislative body]." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).

Nothing on the face of the Ordinance evinces a "plain" intent to authorize inspections inconsistent with Fourth Amendment principles. In practice, the Program affords enrolled complexes multiple procedural safeguards at odds with Plaintiffs' complaints of limitless enforcement discretion. DSD officials, for example, must submit requests to inspect habited units at least ten days in advance. Code § 6-71(c)(1). Where consent is withheld, DSD officials must apply for a warrant, and owners are given meaningful recourse to neutral precompliance review. *See City of L.A. v. Patel*, 576 U.S. 409, 420 (2015) (explaining that "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional" without a warrant, "the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker").

In short, the Program does not, on its face or in practice, violate the Fourth Amendment's prohibition on unreasonable searches, and Plaintiffs' claims fail as a matter of law.

**B. Eighth Amendment – Excessive Fines Claim**

Plaintiffs assert that the City's $100 per unit administrative fee required with enrollment in the Program violates the Eighth Amendment's Excessive Fine Clause. *See* ECF No. 4 ¶¶ 44–46.

The Eighth Amendment states that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST., amend. VIII. To evaluate claims under the Excessive Fines Clause, courts must first determine whether the monetary forfeiture is a "fine" as set out in *United States v. Bajakajian*, 524 U.S. 321 (1998) and *Austin v. United States*, 509 U.S. 602 (1993). In determining whether the monetary forfeiture is a "fine", "the question is not [] whether forfeiture [] is civil or criminal, but rather whether it is punishment." *Austin*, 509 U.S. at 610. Next, courts must assess whether the fine is "grossly disproportional to the gravity of a defendant's offense." *Id*. at 337. If so, the fine is excessive.

The Fifth Circuit previously affirmed the Court's conclusion at the preliminary injunction stage that "the registration fees are not a form of punishment. Their purpose is to cover the administrative costs associated with the additional monitoring of a property once it is enrolled in the [Program]." *SO Apts.*, 109 F.4th at 350. The panel added:

> The manner in which the fees are assessed lends further credence to this point: The enrollment fee is based on the number of units in a property and is directly commensurate to the additional work the City must undertake to monitor the rehabilitation of [enrolled] complexes. Moreover, even if the registration fees were perceived as a form of punishment, they are directly proportional to the anticipated cost of monitoring noncompliant properties relative to their comparative sizes—they are not "excessive."

*Id.*

Plaintiffs insist that Program fees are punitive because they exceed the Program's administrative costs. *See* ECF No. 37 at 5–6 (citing *Bajakajian*, 524 U.S. at 329 (characterizing forfeiture of currency that "*does not* serve the remedial purpose of compensating the Government

for a loss" as punitive because of its deterrent effect) (emphasis added)). But Plaintiffs have cited no case suggesting that courts should treat administrative fees as unconstitutionally punitive fines simply because the government overestimated the costs of administering the program when it established the fee schedule. And Plaintiffs' counsel acknowledged at oral argument that, since the Program was enacted, the City has established a means of refunding Program fees to complexes that graduate early. Of course, the very existence of such a refund suggests that the City intends the Program fees to cover administrative costs based on the duration of enrollment, not to punish complexes enrolled in the Program. In contrast, the City's parallel structure imposing *daily* fines between $100 and $2,000 for Code violations provides a clear example of fines that were intended to be punitive. Code §§ 6-52, 106.3–106.4 ("Each day a violation is permitted to exist shall constitute a separate offense.").

Even assuming that the Program Fees were intended to be punitive, there is no reason to believe that they are constitutionally excessive. The question, with respect to punitive fines, is not whether the fine is disproportionate to the government's administrative costs but whether it is grossly disproportionate to the *gravity of violations*. "[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature[,]" and because "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise," a court should only deem a judgment unconstitutional if the amount of the judgment is "grossly disproportionate to the gravity of *the defendant's offense*[.]" *Bajakajian*, 524 U.S. at 336–37 (emphasis added).

Here, the City Council may very well have reasoned that the gravity of code violations should be tethered to the number of units in a complex because larger complexes will expose more people to harm. A damaged stairwell in a building with 100 units, for example, is likely to pose a

risk to more people—tenants, visitors, mail carriers, maintenance workers, etc.—than a building with 10 units. In any event, Plaintiffs do not raise *any* arguments explaining how the fines at issue in this case are excessive in relation to the gravity of the specific Code provisions that they violated, let alone arguments that account for (a) the refunds they received for their early graduations from the Program or (b) the comparative total of potential daily fines that could have been imposed for the same violations under the City's original enforcement scheme. Code §§ 6-52, 106.3–106.4.[3]

Finally, the fines lie within the range of penalties provided by the City. *See id*. at 339 n.14; *see also United States v. Suarez*, 966 F.3d 376, 387 (5th Cir. 2020) ("If the value of the forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional." (internal quotation and alteration marks omitted)); *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1314 (11th Cir. 2021) (when a judgment "fall[s] below the maximum statutory fine[] for a given offense, the judgment is entitled to a "strong presumption of constitutionality" (citation omitted)).

Plaintiffs' Eighth Amendment challenge to the Program fees fails as a matter of law.

### C. Fourteenth Amendment – Due Process Claims

Plaintiffs challenge the Program under the Due Process Clause of the Fourteenth Amendment on several grounds, asserting that (1) the Code language is vague, (2) the property owner does not have an opportunity to be heard before issuance of the citation and program points are issued, and (3) the Property Maintenance Code interferes with a property owner's right of ownership. ECF No. 4 § C. The Court addresses each theory in turn.

---

[3] It is unclear whether Plaintiffs are making a facial or as-applied Eighth Amendment challenge to the fee language in the Program ordinance. But because the Ordinance itself does not specify a particular amount for the fee, *see* Code, § 6-68(c), a facial challenge claiming that the non-enumerated fee is "excessive" does not make sense. Thus, the Court assumes the challenge is to the fee provision as it was applied to Plaintiffs.

### 1. Vagueness Challenge to the "General Clause"

Plaintiffs assert that the Ordinance's "general clauses" are unconstitutionally vague, including, for example, the following provisions:

> **304.1 General**. The exterior of all occupied or partially occupied structures shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public health, safety, or welfare. Refer to San Antonio City Code, Chapter 12 Vacant Property Owner Registration for additional exterior maintenance requirements for certain vacant properties.

> **506.1 General.** All plumbing fixtures shall be properly connected to either a public sewer system or to an approved private sewage disposal system.

A statute violates the Due Process Clause "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 590, 595 (2015). Though the standard is generally more stringent for criminal cases, courts have held civil laws to the same stringent vagueness standard as criminal laws. *See, e.g.*, *Rost v. United States*, No. 1:19-CV-0607-RP, 2021 WL 5190875, at *6 (W.D. Tex. Sept. 22, 2021) (applying vagueness standard to IRS disclosure requirements enforced by civil penalties), *aff'd*, 44 F.4th 294 (5th Cir. 2022), *reh'g denied*, No. 21-51064, 2022 WL 16569594 (Oct. 11, 2022).

"A statute can be impermissibly vague for either of two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

First, a law is unconstitutionally vague if "it fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited." *Moore v. Brown*, 868 F.3d 398, 406 (5th Cir. 2017) (citation omitted); *Johnson v. United States*, 576 U.S. 591, 595 (2015). Although "'perfect clarity and precise guidance' are not required," *Doe I v. Landry*, 909 F.3d 99, 117 (5th Cir. 2018) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)), the law must provide "sufficient definiteness that ordinary people can understand what conduct is prohibited," *Roark &*

*Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). Thus, the Fifth Circuit has recognized that a law is "unconstitutionally vague on its face [when] it impermissibly subjects [people] to sanctions based not on their own objective behavior, but on the subjective viewpoints of others." *Women's Med. Ctr. at of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001).

Second, a law is vague "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732; *Johnson*, 576 U.S. at 595. "A state's legislative enactment is void for vagueness under the due process clause of the fourteenth amendment if it is inherently standardless, enforceable only on the exercise of an unlimited, and hence arbitrary, discretion vested in the state." *Women's Med. Ctr. at of Nw. Houston*, 248 F.3d at 421 (internal quotation marks and citation omitted). Without "such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)).

"[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications[.]'" *Hill*, 530 U.S. at 733 (quoting United *States v. Raines*, 362 U.S. 17, 23, (1960)). "If a law 'implicates no constitutionally protected conduct,' a court 'should uphold [a facial vagueness] challenge . . . if the enactment is impermissibly vague in all of its applications.'" *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 946 (11th Cir. 2023) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494–95 (1982)).

To begin, Plaintiffs insist that the City is judicially estopped from arguing otherwise because it previously succeeded in a vagueness challenge to a purportedly analogous clause in a Texas Statute, H.B. 2127, the Texas Regulatory Consistency Act ("TRCA"). *See* ECF No. 37 at

8–13.[4] This argument fails out of the gate: the relevant TCRA language bears no resemblance to the "general clause" in this case. Indeed, although the City referred to the challenged language in the 2127 suit as a "general clause" it its pleadings, the provision itself addressed *preemption*:

> PREEMPTION. Unless expressly authorized by another statute, a municipality or county may not adopt, enforce, or maintain an ordinance, order, or rule regulating conduct in a field of regulation that is occupied by a provision of this code. An ordinance, order, or rule that violates this section is void, unenforceable, and inconsistent with this code.

The City's position was that this "general clause" was vague because it failed to specify the subject matter or any statutory provisions. The City's argument was based on the substance of the clause, not, as Plaintiffs suggest here, on its title or the moniker used in the City's pleadings. The "general clause" in the Ordinance is too dissimilar from the TCRA language to draw any meaningful comparison, let alone subject the City to judicial estoppel.

Outside of their objections to the *title* of the general provisions, Plaintiffs fail to demonstrate that any of the provisions, in substance, fails to provide "sufficient definiteness that ordinary people can understand what conduct is prohibited." *Roark & Hardee LP v*, 522 F.3d at 552. The Ordinance very clearly enumerates which pre-existing code violations can serve as the basis of a citation that can turn into a program point. Code § 6-66(c)(8)(a). The list of violations that can lead to a program point puts ordinary people on notice what conduct violates the Program, and is therefore not unconstitutionally vague.

Plaintiffs also enumerate a litany of complaints about other allegedly confusing language in the Code[5] and problems with implementation,[6] but they fail to explain how they have been or

---

[4] *City of Houston et. al. v. Texas*, Cause No. D-1-GN-23-3474 (345th Judicial Dist. of Travis County, 2023).

[5] Plaintiffs complain about the fluctuating use of "ticket" and "citation" in the Code. *See* ECF No. 37 at 15 ("City does not define the difference between a '*ticket*' or a '*citation*.' How is a property owner supposed to know the difference between the two?"). They also object to the "clear and convincing" standard of proof applicable to administrative appeals because it is not defined in the Code. *See id.*

[6] Plaintiffs assert that the City has a custom of failing to describe Code violations with specificity and that the form

are likely to be prejudiced by these alleged deficiencies. *See* ECF No. 37 at 13–16; *Hill*, 530 U.S. at 733 ("[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications[.]'"). Nor do Plaintiffs explain how these minor, theoretical discrepancies could possibly warrant any intervention by a federal court, let alone justify their proposed relief— declaring the entire Program unconstitutional—rather than simply permitting City officials to resolve them in the ordinary course of administering the Program. *See Doe I v. Landry*, 909 F.3d at 117 ("perfect clarity and precise guidance are not required" (quotation marks omitted)).

Plaintiffs' void-for-vagueness challenge fails as a matter of law.

### 2. Procedural Challenge to Appeals Process

Plaintiffs argue that the Program violates their due process rights because it lacks (1) any process to appeal enrollment, (2) review by a neutral decision maker, (3) ability to challenge the fee amount, or (4) pre-deprivation hearings before "substantial" fees are imposed. ECF No. 37 at 7. These arguments are unpersuasive, however, because they overlook the practical realities of the Program's process for issuing program points and administering appeals and demand more process than the Constitution requires, given the low risk of erroneous deprivation of Plaintiffs' property rights.

"A government decision depriving an individual of his right to 'life, liberty or property' must, at a minimum, be preceded by notice and an opportunity for the individual to be heard." *Morris v. Livingston*, 739 F.3d 740, 750 (5th Cir. 2014) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Procedural "[d]ue process 'requires only notice that is both adequate to apprise a party of the pendency of an action affecting its rights and timely enough to

---

notice of violation stating that the citation "may" lead to a Program point conflicts with the Code's mandate that a citation "will" generate a point. *See* ECF No. 37 at 14.

allow the party to present its objections.'" *Burns v. Harris Cnty. Bail Bond Bd.*, 139 F.3d 513, 521

(5th Cir. 1998) (quoting *In re Christopher*, 28 F.3d 512, 519 (5th Cir. 1994)). This inquiry requires

a balancing between the private and governmental interests concerned, as articulated in *Mathews*

*v. Eldridge*, 424 U.S. 319, (1976), and its progeny.

Specifically, courts must consider three factors in this balancing analysis: (1) "the private

interest that will be affected by the official action"; (2) "'the risk of an erroneous deprivation'

under the procedures provided"; and (3) "the Government's interest, including the function

involved and the fiscal and administrative burdens that . . . additional or substitute procedural

requirements would entail." *Bevis v. City of New Orleans*, 686 F.3d 277, 280–81 (5th Cir. 2012)

(cleaned up) (citations omitted).

The Fifth Circuit has already addressed Plaintiffs' argument that the Program improperly

deprives them of their $100-per-unit registration fees without due process, and Plaintiffs' have not

proffered any evidence that would require a different outcome on summary judgment:

> Although the Complexes correctly identify the $100 registration fee as a
> property interest, the "risk of an erroneous deprivation" is low under the
> PAIP's existing procedures. Under the PAIP, an apartment complex owner
> *must* receive notice of a Code violation before a citation can issue. Code §
> 6-67(a)(1). Only if the property owner fails to cure a violation is a citation,
> and program point, issued. *Id.* § 6-67(d)(1), (2). Importantly, the program
> point is not applied until (1) the ten-day administrative appeal period expires
> if the owner fails to appeal; or (2) if there is an appeal, then only after the
> code official has made a finding against the owner and the property. *Id.* § 6-
> 67(d)(3). Additionally, a property manager may appeal the issuance of a
> program point separately and concurrently from the underlying citation. In
> other words, a property owner, even if the code official rules against them
> with respect to the program point, may still separately and concurrently
> appeal the underlying citation through the judicial review process. *Id.* § 6-
> 67(e)(5).

*SO Apts.*, 109 F.4th at 351–52.

In other words, complexes actually get two bites at the apple, through both an administrative appeal and judicial review of the citation Code §§ 6-66 *et seq.* Even if the program point withstands the appeal, if the underlying citation is set aside, the program point will be removed and the associated fees will be returned.

Still, Plaintiffs object to the absence of a specific process for contesting their enrollment in the Program after the third violation. ECF No. 37 at 7. Given the ample opportunities to appeal both program points and the underlying citations (or simply cure the violations), Plaintiffs have not demonstrated that separate process for challenged Program enrollment is constitutionally required. The City offers an apt analogy:

> Putting it in terms of baseball, being enrolled in the Program is analogous to being called out after three strikes. Plaintiffs are now in the dugout complaining they do not have means to challenge the out call when the rules afforded them the opportunity to challenge each individual strike.

ECF No. 38 at 6 n.2. It is not clear what standard the Plaintiffs think should apply in reviewing Program enrollment or who should be empowered to conduct such a review. Thus, there is no evidence that such an appeal would reduce the risk of erroneous deprivation (beyond simply providing a third bite at the apple), let alone evidence of benefits that could justify the fiscal and administrative burdens that an additional level of appellate review would entail. *Bevis*, 686 F.3d at 280–81.

Outside of the administrative fees, Plaintiffs' fixation on challenging Program enrollment appears to be concerned with the additional scrutiny that enrollment in the Program invites. Still, they have not objected to the substantive validity of any of the Code violations discovered at their complexes while they were enrolled in the Program. Nor do they assert that violations discovered during enrollment are subject to a discriminatory standard (by, e.g., applying a lower threshold for violations or providing less robust notice-and-cure procedures). Even if Plaintiffs were wrongfully

enrolled in the Program, however, the Court is not aware of a "fruit-of-the-poisonous-supervision" doctrine that would excuse them from accountability for Code violations discovered during inspections conducted under the Program. In a parallel criminal context, an exoneree may still face charges for crimes he commits while in prison or on parole or probation, even if the conviction that led to his original confinement or supervision is ultimately overturned. The constitutional harm that Plaintiffs have allegedly suffered—being forced to cure legitimate Code violations discovered while they were enrolled in the Program—is simply not cognizable. Plaintiffs do not have a property interest in ensuring that their Code violations remain undetected.

In weighing the three factors employed to evaluate the adequacy of process, such an extensive review process poses a low risk of erroneously "depriving" apartment complex owners of the $100 per-unit enrollment fee. *See Bevis*, 686 F.3d at 280–81. Indeed, as the City points out, "[t]he very fact that over 1,000 apartment complexes have avoided receiving three program points—and therefore avoided required enrollment in the Program—speaks to the exacting nature of the program point process." ECF No. 34 at 22–23; *see also SO Apts.*, 109 F.4th at 351 n.29.

In contrast, the Fifth Circuit recognized that "the City's and public's interests are weighty: The City is responding to a documented issue of improper housing conditions and is trying to improve the safe living conditions of those residents that ordinarily could not advocate for themselves." *Id.* 352; *Mackey v. Montrym*, 443 U.S. 1, 17 (1979) ("We have traditionally accorded the states great leeway in adopting summary procedures to protect public health and safety.").

Plaintiffs have failed to identify a triable fact issue as to the constitutional adequacy of the Program's enrollment and appeal procedures under the *Mathews* balancing test, and the City is entitled to summary judgment on Plaintiff's due process claims.

### 3.  Interference with Plaintiffs' Ownership Rights

Finally, Plaintiffs argue that the Code prevents them from freely disposing of their property, amounting to an "unconstitutional taking" in violation of their Fourth Amendment due process rights. ECF No. 4 ¶ 78. A long-standing City ordinance, independent of the Program, requires a property owner to either remedy code violations prior to selling the property or inform the purchaser of the unresolved code violation that will transfer with the property. Code § 6-52, 107.6.

This choice—between bringing the property to compliance or notifying the buyer about non-compliance—does not prevent the transfer of property. Indeed, the City has no authority to stop a property sale. It merely provides a means for the City to issue a citation *after* a transfer takes place. "At most, the City may impose a fine for noncompliance (which the Complexes have not challenged on due process grounds)." *SO Apts.*, 109 F.4th at 351.

Plaintiffs have failed to show that § 6-52, 107.6 deprives them of any right to sell their property, and their due process claim fails as a matter of law. *See id.* ("As to the restriction on the transfer of property, the Complexes' argument fails at the first step in the balancing analysis because Code § 6-52, 107.6 does not deprive the Complexes of their right to sell their property.").

In sum, Plaintiffs' Fourteenth Amendment due process challenges to the Ordinance and Program fail as a matter of law.

### CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 34) is **GRANTED**. A final judgment will follow pursuant to Rule 58.

It is so **ORDERED**.

**SIGNED** this 22nd day of May, 2025.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE